## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| K.D. and A.D.<br><br>        **Plaintiffs,**<br><br>vs.<br><br>**ANTHEM BLUE CROSS and BLUE SHIELD, GROUP HEALTH PLAN OF UNITED TECHNOLOGIES CORPORATION,**<br><br>        **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:21-cv-343-DAK-CMR<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Cecilia M. Romero |

This matter is before the court on Plaintiffs K.D. and A.D.'s Motion for Summary Judgment [ECF No. 44], and Defendants Anthem Blue Cross and Blue Shield and Group Health Plan of United Technologies, Corporation's Joint Motion for Summary Judgment [ECF No. 37]. On April 5, 2023, the court held a hearing on the motion.   At the hearing, Brian S. King represented Plaintiff, and Angela D. Shewan and Jessamyn E. Vedro represented Defendants. The court took the motion under advisement.   The parties submitted supplemental briefing after the hearing.   The court considers the motions fully briefed.   After carefully considering the memoranda filed by the parties and the law and facts relevant to the pending motion, the court issues the following Memorandum Decision and Order.

## BACKGROUND

These are cross motions for summary judgment on Plaintiffs' appeal of Defendants Anthem Blue Cross Blue Shield and The Group Health Plan of United Technologies Corporation's denial of benefits under the Plan for A.D.'s residential and transitional treatment.   Plaintiffs also bring a claim for violation of the Mental Health Parity and Addiction Act of 2008 ("Parity Act").

Anthem is the third-party claims administrator for the Plan.   K.D. is a participant in the Plan. K.D.'s daughter, A.D., is a beneficiary under the Plan.

### A.   The Plan

The Plan provides benefits for services that Anthem determines are "medically necessary." Under the Plan, medically necessary services are those "required to meet your essential health needs" and must be "rendered in the least intensive setting that is appropriate for the delivery of health care."   The Plan covers residential treatment for mental health conditions if it is medically necessary.   The Plan also requires precertification for medical necessity and a predetermined length of stay for all inpatients benefits, like residential treatment.   Following precertification of admission, inpatient stays are also subject to concurrent reviews.   A concurrent review may permit additional benefits for care exceeding the benefits originally authorized.

Anthem uses clinical guidelines to assist in determining medical necessity.   Anthem uses Milliman Care Guidelines ("MCG") to review the medical necessity of inpatient stays.   Anthem's Office of Medical Policy and Technology Assessment ("OMPTA") develops medical policy and clinical guidelines for medical, surgical, and behavioral health treatments.   Anthem's OMPTA has a Medical Policy and Technology Assessment Committee ("MPTAC") that consists of a "multiple disciplinary group" of physicians from various medical and behavioral health specialties, clinical practices, and geographic areas.   Anthem's OMPTA provides agenda items for MPTAC to review and authorize, including use of medical necessity criteria developed by external entities, including the MCG guidelines used for inpatient stays.

The MCG residential treatment criteria provide that residential treatment is appropriate when the patient's behavioral health disorder is a danger to self, danger to others, or causes serious dysfunction in daily living.   Treatment services at the proposed level of care are appropriate when

the specific condition related to admission is present and is judged likely to deteriorate in the absence of treatment at the proposed level of care or the patient is receiving continuing care and services at the proposed level of care are necessary.   Residential care is appropriate if the recommended treatment is "necessary, appropriate, and not feasible at lower level of care."   The criteria also deal with when a patient can be discharged.

If a member disagrees with Anthem's determination of medical necessity, the Plan permits members to file two levels of appeal prior to filing a lawsuit.

**B.   A.D.'s History**

A.D. was born in September 2000.   A.D.'s biological father struggled with mental health disorders, divorced K.D., and committed suicide when A.D. was ten years old.   After her father died, A.D. began to struggle with severe social anxiety and severe depression, experiencing a great deal of suicidal ideation.   During eighth and ninth grade, A.D. attended a partial hospitalization program to treat her mental health symptoms.   A.D. then received dialectical behavioral therapy and began going back to school in eleventh grade when she had shown some improvement.

A.D.'s symptoms, however, worsened when she began attending college in the Fall of 2018.   She stopped taking her medications for depression, anxiety, and ADD.   She also failed to follow through with psychiatric care or therapy and stopped going to classes.   At this time, A.D. began engaging in criminal behavior.   She started stealing items to pawn them for money so she could buy drugs and alcohol.   She also started demonstrating a high level of aggression.   She lost twenty pounds and occasional slept outside on park benches.   After forty-five days, A.D. dropped out of college.

After dropping out of college and returning home, A.D.'s symptoms improved only marginally as she began taking her medications and attending therapy again.   But A.D.'s behavior

worsened until her mother and therapists recommended that she attend a treatment to transition program to help her stabilize her mental health problems and address her poor coping strategies.

On June 3, 2019, A.D. began attending Fulshear Ranch Academy's Treatment to Transition program.   Fulshear's Treatment to Transition program is nine to twelve months long, with discharge determined by the client's progress on goals, participation, and clinical recommendations.   Patients begin receiving mental health care in a residential mental health treatment setting and then eventually transition to a less intensive type of mental health treatment called "transitional living" treatment.

Anthem initially approved benefits for A.D.'s residential treatment at Fulshear for seven days.   At Fulshear, A.D. was diagnosed with ADHD, major depression, and generalized anxiety disorder with active suicidal ideation and increased frequency and planning of suicide over the past couple of months.   She had one past suicide attempt when she tried to overdose on medication that required an overnight hospital stay.   She was noted as presenting problems with lack of motivation, anxiety and depression, life skills, finding interests and passions, self-love, and respect.   At Fulshear, A.D. received a mix of individual, group, and family therapy and was taught life skills.   She also received monthly psychiatric evaluations and a treatment team updated her treatment goals monthly.

Based on continuing care reviews and peer-to-peer reviews, Anthem approved A.D.'s residential treatment for another nine days, through June 19, 2019.   On June 21, 2019, Anthem scheduled a peer-to-peer discussion with A.D.'s treating provider at Fulshear, Dr. Norma Clark, to obtain more clinical information relevant to continuing coverage.   But Dr. Clark did not attend the scheduled call.   After waiting until the end of the scheduled time, Dr. Shah, Anthem's physician reviewer, reviewed the information Fulshear had previously provided.   He decided that A.D. no

4

longer met the clinical criteria for residential treatment based on those materials and denied the request for additional dates of service as not medically necessary.

### C.   Benefit Denials and Appeals

On June 21, 2019, Anthem sent Plaintiffs a denial letter for any further residential care benefits.   The letter acknowledged that the program asked to extend A.D.'s stay.   But Anthem stated that the information it had did not show that A.D. was a danger to herself or others or that she was having serious problems functioning.   Therefore, Anthem explained that the request to extend her stay was denied because it did not meet the requirements for being "medically necessary" under the Plan.

Anthem states that despite the denial, it continued to follow up with Fulshear regarding A.D.'s discharge.   Fulshear did not respond to Anthem's requests for information.   A.D. ultimately received treatment through Fulshear's residential treatment from June 3, 2019, to August 27, 2019.   A.D. then received treatment at Fulshear's transitional living program from August 28, 2019, through May 15, 2020.   Although A.D. stepped down to the transitional living program on August 28, 2019, Anthem now claims that Plaintiffs did not submit A.D.'s inpatient transitional living program claims for precertification as required by the Plan.[1]

On December 11, 2019, Plaintiffs sent Anthem a letter appealing its denial of coverage for A.D.'s residential treatment benefits.   Plaintiffs also claim this letter appealed Anthem's denial of benefits for the transitional living treatment, while Anthem claims that Plaintiffs had not submitted a claim for transitional living benefits at that time.   Plaintiffs' appeal letter stated that their appeal

---

1.   Despite its determination that A.D.'s residential treatment was no longer medically necessary, and that A.D. could be safely treated at a lower level of care, Anthem mistakenly continued to pay for A.D.'s residential treatment until July 31, 2019.   Based on the Plan's permitted amount, Defendants paid Fulshear for A.D.'s residential treatment from June 3, 2019, through July 31, 2019.

was directed to "dates of service" from "6/20/2019 – 8/27/2019" for A.D.'s "Residential

Treatment Center" care and to "Dates of Service" from "8/28/2019 – Discharge" for A.D.'s

"Young Adult Transitional" care.   Anthem claims that its denial of the transitional living

treatment occurred much later, on April 24, 2020.

      Plaintiffs' appeal contained A.D.'s medical records from her treatment at Fulshear up to

the latest date Plaintiffs could obtain, as well as letters from mental health professionals who had

previously treated A.D. and who believed the treatment A.D. received at Fulshear was medically

necessary.   For example, Laura Lemmy, LCSW-R, opined that she had recommended a

residential treatment facility because A.D. was unable to perform activities of daily living, could

not perform personal hygiene tasks, could not follow through on simple tasks because of

debilitating anxiety and depression, and A.D. had exhausted all outpatient treatment modalities.

Although Ms. Lemmy recognized that during residential treatment A.D. had made progress in

activities of daily living, coping skills, and learning how to engage appropriately in the community

without putting herself at risk, she opined that A.D. needed to continue in the program to maintain

those gains and progress.

      Matthew Sharpe, MS, NPP, opined that A.D. needed the continued treatment at Fulshear

because it was evident that while A.D. was away at college, she could not live independently and

could not function in even a basic way without a great deal of structure.   Even with support, A.D.

struggled and continued to struggle with basic tasks.   He stated that he was confident that if she

did not continue with the residential treatment level of care that she was receiving at Fulshear, she

would be at extremely high risk of not improving, self-harm, suicide attempts or completion,

worsening substance abuse, dangerous impulsive behavior, and involvement in the legal system.

      On February 11, 2020, Anthem sent Plaintiffs another denial letter, indicating that it had

reviewed all the information it received initially and for the appeal.   The letter stated that although A.D.'s doctor wanted A.D. to stay in residential treatment care longer, Anthem still did not think it was medically necessary for her.   Anthem explained that its initial denial was correct because after the treatment A.D. had, she was no longer at risk for serious harm requiring 24-hour care.

On April 3, 2020, Plaintiffs appealed Anthem's second denial.   The appeal again provided the dates for benefits they were seeking for residential treatment and transitional treatment.   On June 3, 2020, Defendants sent another denial letter indicating that Plaintiffs second appeal was also denied.   Defendants explained that after her initial treatment at Fulshear, A.D. was no longer at risk of serious harm without 24-hour care and she could be treated with outpatient services. Defendants stated that they based the decision on the MCG guideline Residential Behavioral Health Level of Care, Adult, and directed her to the definition of "medically necessary" in the Plan benefit booklet.

Defendants' denial letters do not distinguish between Fulshear's residential treatment program and its transitional living program.   Defendants state that the distinction was not made because Plaintiffs were appealing the initial denial of residential care and the denial was for the period of when A.D. was in residential care.   Plaintiffs state that there is no evidence in the prelitigation appeal record demonstrating that Defendants communicated independent reasons to deny A.D.'s claim for transitional living treatment.   But Defendants claim that they sent Plaintiffs a letter on April 24, 2020, in which they separately explained their denial of coverage for A.D.'s claims for the transitional living treatment.

### D.  Current Litigation

In response to Defendants' denials of benefits, Plaintiffs filed the present action, alleging two causes of action: (1) Plaintiffs' first cause of action asserts a claim for benefits under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B); and (2) Plaintiffs' second cause of action alleges a violation of Mental Health Parity and Addiction Equity Act ("MHPAEA"), 29 U.S.C. § 1185a(3)(A) because the Plan allegedly treats residential mental health treatment differently than skilled nursing or subacute facility treatment for medical/surgical treatment.

## DISCUSSION

### Cross Motions for Summary Judgment

The parties bring cross motions for summary judgment on Plaintiff's ERISA benefits claim and Parity Act claim. The parties dispute whether A.D.'s continuing residential treatment at Fulshear was medically necessary.   Plaintiffs argue that Defendants denied the claim without engaging in a full and fair review, whereas Defendants assert that the administrative record as a whole provides substantial evidence supporting their denial of benefits.   The parties also dispute whether Defendant's internal Milliman Care Guidelines for residential mental health treatment violate the MHPAEA because they allow treatment to be discontinued before analogous treatment in the medical/surgical context is discontinued.

### A. Standard of Review

As an initial matter, the parties disagree on the standard of review this court should employ. Defendants argue that the discretionary language provided in the Plan requires the court to use the arbitrary and capricious standard of review, and Plaintiffs claim that Defendants' procedural irregularities require the court to use a de novo standard of review.

The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire and Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989). When a plan gives an

administrator this discretion, a court applies a "deferential standard of review, asking only whether

the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541

F.3d 1002, 1010 (10th Cir. 2008) (citation and internal quotation marks omitted).   Under arbitrary

and capricious review, the actions of ERISA administrators are upheld if reasonable and supported

by substantial evidence.   *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir.

2006).   In this case, the Plan grants Anthem the right to interpret the medical provisions of the

plan" and provides that "[b]enefits under this plan will be paid only if the health plan vendors

[Anthem], in their discretion, determine that the claimant is entitled to them."

But a court may give less deference to a plan administrator if the fiduciary fails to follow

certain ERISA procedures.

> Under Tenth Circuit precedent, de novo review is appropriate despite a plan's
> conferral of discretion on a plan administrator if: the administrator fails to exercise
> discretion within the required timeframe; the administrator fails to apply its
> expertise to a particular decision; the case involves serious procedural
> irregularities; the case involves procedural irregularities in the administrative
> review process; or where the plan members lack notice of the conferral of
> administrator discretion over the plan.

*James C. v. Aetna Health & Life Ins. Co.*, Case No. 218-cv-00717-DBB-CMR, 2020 WL 6382043,

at *7 (D. Utah Oct. 30, 2020) (footnotes and quotation marks omitted); *see also Martinez v.*

*Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015); *Mary D. v.*

*Anthem Blue Cross Blue Shield*, 778 Fed. App'x 580, 589 (10th Cir. 2019).   None of those

situations are present here. Plaintiffs identify five alleged irregularities but they have more to do

with their disagreements on the merits than procedural irregularities that would affect the level of

deference.   Accordingly, the court will apply the deferential arbitrary and capricious standard of

review to Plaintiffs' claim.

### B. ERISA Benefits Claim

Plaintiffs assert that Defendants' adverse benefits decisions were arbitrary and capricious under the terms of the Plan.   The arbitrary and capricious review of an ERISA benefits decision looks to whether the decision: "(1) . . . was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan." *Id.* at 854 (citations omitted). Additionally, failure to "consistently apply the terms of an ERISA plan" and inconsistent interpretations with the "plans unambiguous language" are considered arbitrary and capricious. *Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 853–54 (10th Cir. 2020) (citation omitted).

### 1.  Residential Treatment Claim

Plaintiffs contend that Defendants abused their discretion in denying A.D.'s claims for residential treatment at Fulshear's from June 20 through August 27, 2019, because they failed to provide a full and fair review.   Defendants, however, argue that the administrative record provides substantial evidence that Anthem's benefits decision was reasonable.

Under the Plan's residential treatment clinical guidelines, residential care is no longer needed if the patient's stabilization and improvement is demonstrated by the patient no longer being a danger to oneself or others, the patient having no essential function impaired, or the ability to manage such dangers and/or loss of function at a lower level of care.   Anthem's initial denial letter to Plaintiffs acknowledged that the program asked to extend A.D.'s stay, but the information Anthem had did not show that A.D. was a danger to herself or others or that she was having serious problems functioning.   Therefore, Anthem explained that the request to extend her stay was denied because it did not meet the requirements for being "medically necessary" under the Plan.

Plaintiffs' appeal of this denial included A.D.'s medical records from her treatment at Fulshear to the latest date that Plaintiffs could obtain and letters from A.D.'s treating providers—Ms. Lemmy, LCSW-R and Mr. Sharpe, MS, NPP—at the time she entered Fulshear's program.   Both of her treatment providers opined that A.D. needed continued residential treatment after June 20, 2019, to maintain her improvements in her ability to care for herself, perform the activities of daily living, and function even in a basic way without a great deal of structure being imposed upon her.   Mr. Sharpe indicated that he was confident that if she did not get this level of treatment, A.D. would be "at extremely high risk of not improving" and that subsequently "self-harm, suicide attempts or completion, worsening substance abuse, dangerous impulsive behavior, and legal system involvement" would become "increasingly more likely." These opinions are based on treatment over a period of time and recognize A.D.'s ongoing struggle with self-harm and dysfunctional behaviors.   These opinions support a finding that A.D.'s needs could not be met at a lower level of care after only a few days of inpatient treatment.

Defendants argue that despite these opinions from A.D.'s treating providers, Anthem reasonably determined that A.D.'s residential treatment was no longer medically necessary because administrators are not required to "accord special weight to the opinions of a claimant's physician."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).   Defendants cite to an unpublished Tenth Circuit case stating that, while a claims administrator must consider the letters and records submitted in connection with an appeal and "take[] these materials and arguments into account," in reaching a decision, there is no obligation to "affirmatively respond to these submissions."  *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 590 (10th Cir.

2019) (unpublished).   However, *Mary D.* is an unpublished, nonbinding case, and the Tenth

Circuit has rejected similar arguments in more recent cases.   *See David P. v. United Healthcare*

*Ins.,* 77 F.4th 1293 n.15 (10th Cir. 2023) (petition for rehearing pending).   In *D.K.*, the Tenth

Circuit held that the plan administrator was required to "engage with and address" the opinions of

three treating health care providers who opined that the patient needed additional time at an RTC.

*D.K. v. United Behavioral Health*, 67 F.4th 1224, 1237 (10th Cir. 2023). "By not providing an

explanation for rejecting or not following these opinions, that is, not 'engaging' with these

opinions. United effectively 'shut its eyes' to readily available medical information." *Id.*   The

Tenth Circuit has long held that claims administrators are not permitted to "shut their eyes to

readily available information when the evidence in the record suggests that the information might

confirm the beneficiary's theory of entitlement and when they have little or no more evidence in

the record to refute that theory." *Gaither v. Aetna Life Ins.*, 394 F.3d 792, 807 (10th Cir. 2004).

        Contrary to Tenth Circuit precedent, Defendants argue that the regulations that apply to the

initial denial of disability claims are not the same as the regulations for the initial denial of a claim

for health care benefits.   Defendants assert that adverse determinations under a group health plan

do not require the same extensive discussion or explanation of why the administrate did not agree

with the member's treating providers.   But the Tenth Circuit has held that "the textual difference

in the ERISA disability and ERISA medical regulations" addressing denials of claims do not

"absolve [the plan administrator] from its duty to engage in meaningful dialogue that includes a

full and fair review of the insured's claim."   *D.K.*, 67 F.4th at 1238.

        Anthem needed to fully engage with the opinions of A.D.'s treating providers.   However,

the only reference in Anthem's denial letters to A.D.'s treating providers was that her doctors

wanted her to stay in the RTC longer.   The letters did not address why the treating providers

thought A.D. required a longer stay or why the plan administrator determined that those opinions were not persuasive.   The treatment providers explained the need for extended treatment.   But Anthem's denials only stated that after the few days of treatment A.D. received at Fulshear, she was no longer at risk for serious harm that needed 24-hour care.   There was no discussion of A.D.'s history of dysfunctional living behaviors.   Obviously, A.D. could not self-destruct within the structure of the RTC.   But that does not mean that a few days in that structured environment had cured her of those tendencies.   Anthem's denials of Plaintiffs' appeals did not engage in a meaningful dialogue regarding the coverage issue.   It is not enough for defendant claims administrators to simply "acknowledge" the contrary recommendations of treating providers, but that the administrators must "engage" with them by providing some "explanation for their disagreement" with those professionals.   *Theo M. v. Beacon Health Options*, 2022 U.S. Dist. LEXIS 177120, *42-51 (D. Utah 2022).   Judge Parrish held that Defendants were obligated to "respond to 'diagnoses and reports' offered by claimants with 'more than conclusory statements such as "[y]ou could have been treated with outpatient services,' or 'you no longer need 24 hour structured care.'"   *Id.* at *49.

In this case, Defendants relied solely on conclusory statements that they relayed without factual support.   Defendants ignored the opinions of A.D.'s treating professionals. The administrative record confirms that Anthem's physician-reviewers "reviewed" certain records and notes, finding some records from A.D.'s prior treatment facilities inapplicable.   None of these comments stating that they reviewed records grapples with the contents of those records and responds to the substance of the treating providers' information.   It is also curious that they would find A.D.'s medical history to be completely inapplicable to the appeal, without explaining why that would be the case.   The longer a patient has struggled with a problem, the longer it may take

to fix the problem.   That is not addressed.   Anthem took the detailed information Plaintiffs submitted regarding her condition and needs and boiled it down to "your doctor wanted you to stay longer."   This does not address the reasons why the doctor wanted her to stay longer.

Defendants also argue that the opinions of A.D.'s prior outpatient therapists fail to establish the medical necessity of A.D.'s continued residential treatment and should be disregarded because there is no evidence in the record that these therapists were treating A.D. while she was in residential treatment.   But if their opinions were outdated, the plan administrator should have stated that as a reason for disregarding them at the time of the denial.   Counsel for the plan administrator cannot come up with new reasons for dismissing the opinions in litigation. It appears to the court that the opinions from A.D.'s prior treatment providers were done for purposes of the appeal, they addressed her history and the care she needed at Fulshear.   Those opinions appear as timely as Anthem's medical reviewers' opinions.   Moreover, the letters provide detailed and reasoned explanations for why A.D. required an extended period of residential treatment. Anthem, however, did not engage with that reasoning.   Anthem merely stated that A.D.'s two weeks of residential treatment was all that was necessary for A.D. to step down to a lower level of care.   Anthem, however, gave no supporting facts for determining that the shortened period of treatment was all A.D. required and no detailed response to A.D. treatment providers' reasons for a longer stay.   Anthem's denial letters leave the plan beneficiaries and this court with more questions regarding the decision than reasons supporting it.

Defendants also argue that rather than engage with Plaintiff's providers' opinions in its communications with Plaintiffs during their appeals, it only needed to engage with A.D.'s treating physicians a Fulshear.   Because Dr. Clarke missed a meeting scheduled with Anthem, Anthem argues the failure to engage was on Plaintiffs' side.   Although this argument could possibly

14

support Anthem's initial denial, which it issued immediately after the missed meeting, it ignores all the information Plaintiffs provided with their appeals.   Anthem was required to engage with and address the materials Plaintiffs provided on appeal.   Anthem merely continued to state that its original decision had been correct.   Anthem's denial letters do not reflect a reasoned application of the Plan's language to the materials before it.   Anthem's communications with Plaintiffs throughout the appellate process lacked any kind of meaningful dialogue or engagement.

Defendants further argue that Plaintiffs were able to obtain the reviewers' clinical notes, including notated medical records, but they do not demonstrate how reasonably clear these notes communicate the bases for denying Plaintiffs' claim.   Informing Plaintiffs that they can receive more information about the decision does not meet Defendants' burden to explain to Plaintiffs the scientific or clinical reasons supporting the determination.   Even if the record did demonstrate that Defendants sent the cited pages comprising internal notes, the notes do not improve Defendants' compliance with ERISA's claim procedure regulations.   The denial rationales listed in the notices appear essentially identical to the rationales listed in Defendants' denial letters.   The remainder of the notes simply list interactions Defendants' internal reviewers had with Fulshear personnel, provide vague and conclusory statements that A.D. did not meet the guidelines, and state that the internal reviewers believed her treatment should not be covered.   The notes do not cite to specific portions of A.D.'s medical records, do not address disagreements the reviewers had with A.D.'s treatment providers, and do not explain the underlying factual bases for Anthem's reviewers' contrary rationales.

Defendants have a fiduciary duty to plan beneficiaries to communicate the bases for their decisions.   Anthem's failures to address her treating provider's opinions and to communicate effectively and meaningfully with Plaintiffs regarding the factual bases for denying coverage puts

into question whether it conducted a full and fair review of the claim.   The denials do not appear

to be part of a reasoned and principled process.   The court, therefore, concludes that Defendant's

denial of benefits for A.D.'s continued residential treatment at Fulshear was arbitrary and

capricious.

   "[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and

capriciously in handling a claim for benefits, it can either remand the case to the administrator for

a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of

benefits." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006)

(citations and internal quotation marks omitted). "The remedy when an ERISA administrator fails

to make adequate findings or to explain adequately the grounds of her decision is to remand the

case to the administrator for further findings or explanation." *Id.* at 1288 (citation omitted).

Remand is unnecessary only when "the evidence clearly shows that the administrator's actions

were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan

administrator to deny the application for benefits on any ground." *Id.* (citations and quotation

marks omitted).

   In this case, Anthem failed to consider or address all the evidence before it, failed to have a

meaningful dialogue with the claimant regarding the decision, and failed to engage or

communicate reasonably clearly with Plaintiffs.   In such a situation, the most appropriate remedy

is to remand Plaintiff's claims to Anthem for a proper, full and fair review of the claim.   This is

not a case, like *D.K.*, where the entitlement to benefits is clear on the record.   However, the court

grants Plaintiff's motion for summary judgment in part and denies Defendant's motion for

summary judgment on this claim.

   Because remand is the appropriate remedy, the court concludes that there is no basis for

awarding prejudgment interest at this time.   However, Plaintiffs have "achieved 'some degree of success on the merits" and may move for their reasonable attorney's fees under 29 U.S.C. § 1132(g)(1) within twenty days of the date of this Order.   *Cardoza v. United of Omaha Life Ins.*, 708 F.3d 1196, 1207 (10th Cir. 2013).

2. **Transitional Living Claim**

Plaintiffs argue that Defendants' denials of A.D.'s claim for transitional living treatment from August 28, 2019 through May 15, 2020, should be remanded because Anthem applied the wrong clinical criteria to the claim.   Defendants, however, argue that Plaintiffs failed to exhaust administrative remedies as to the transitional living claim.

Part of the miscommunication on coverage for A.D. time in Fulshear's transitional living setting appears to relate to the fact that it is part of one program that includes a residential treatment component and a transitional living component.   A.D. began attending, and Anthem approved of her attending, Fulshear's Treatment to Transition program on June 3, 3019.   Fulshear's Treatment to Transition program is designed to be 9 to 12 months of treatment, where the patient begins receiving mental health care in a residential mental health treatment setting and then transitions to a less intensive and restrictive type of transitional living treatment.   Anthem originally approved of A.D.'s admission into the program.   Anthem's original denial of coverage, however, dealt only with A.D.'s residential treatment because Plaintiff was still in the residential treatment portion of the program.   Plaintiff had only been in the program for approximately 18 days when Anthem denied further coverage.   But Plaintiff remained in the program and moved into the transitional living setting by the time she appealed Anthem's denial.   Plaintiffs' appeals of the denial, therefore, all mention coverage for the residential and transitional living treatment settings at Fulshear.

17

Plaintiffs also alleged in their Amended Complaint that they had exhausted the prelitigation appeal process for both their claims and Defendants admitted that Plaintiffs had exhausted all their prelitigation appeal obligations for the treatment A.D. received at Fulshear. Defendants now argue, however, that Plaintiff's never appealed from an April 24, 2020 letter Anthem sent to Plaintiffs that specifically denied coverage for A.D.'s transitional living treatment. Although Anthem's April 24, 2020 letter denying the transitional living claim appears to be the first time Anthem had a medical reviewer deny a separate claim for the transitional living claim, that does not mean that Plaintiffs had not previously asked for coverage in that setting.   Plaintiffs included the dates for the transitional living treatment in all their appeals.   Anthem's letter appears to be an untimely response to Plaintiffs' appeals.

The fact that Defendants did not notice the request or engage with the request is another example of Defendants' failure to engage in a meaningful dialogue with the claimant.   Anthem approved of her attending a Treatment to Transition program and then appears to have no knowledge of the transition portion of the program.   Given that it is one program, it is unclear to the court whether coverage for the two settings is really two claims or a continuation of A.D.'s original residential treatment claim.   When Anthem denied A.D.'s continuation of residential treatment in part because she no longer needed 24-hour care, Anthem made no mention of whether A.D. should have transitioned at that time to the transitional living setting.   Anthem states that it repeatedly contacted Fulshear about A.D.'s discharge, therefore, Anthem appears to have thought she would be discharged entirely.

Plaintiffs' prelitigation appeals to Anthem clearly referred to coverage for the transitional living treatment.   It is also clear from Anthem's repeatedly cryptic denials of those appeals that Anthem was not engaged enough in the facts of A.D.'s case nor committed enough to a meaningful

dialogue with Plaintiffs during the appellate process to be aware of or address coverage for the transitional living portion of the program that Anthem initially approved of A.D. attending. Because the problems associated with determining whether the transitional living claim was properly raised, denied, or appealed stem from Anthem's breach of its fiduciary duty to Plaintiffs and statutory duties under ERISA, the court concludes the appropriate remedy is to remand the claim to the plan administrator alongside the residential treatment claim.   On remand, Anthem should determine in good faith whether the transitional living claim should be considered an outgrowth of and part of the residential treatment claim or whether the transitional living claim is a separate claim that Anthem should have addressed in relation to Plaintiffs' appeals.   Therefore, the court grants Plaintiff's request to remand this claim and denies Defendant's motion for summary judgment on the claim.

### C.   Parity Act Claim

Plaintiffs argue that Defendants violated the Parity Act because Defendant's internal guidelines indicate that Defendants contemplate discharging residential mental health patients at any time after admittance, but only contemplate discharging medical/surgical patients after they are provided with a course of treatment and have completed two stages of their planned course of treatment.   Congress passed the Parity Act "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."   *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016).   To demonstrate a Parity Act claim, Plaintiffs must demonstrate: (1) the Plan is subject to the Parity Act; (2) the Plan "provides benefits for both mental health/substance abuse and medical/surgical treatments"; (3) Defendants place "differing limitations on benefits for mental health care" as compared to analogous

"medical/surgical care"; and (4) the limitations on mental health care are more restrictive than the predominant limitations based on the medical/surgical analogues.   *D.K. v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 8888, at *9 (D. Utah January 17, 2020).   The parties do not dispute the first two elements.

Plaintiffs withdrew their Parity Act claim with respect to A.D.'s transitional living claim. Therefore, Plaintiffs' Parity Act claim relates only to whether the discharge criteria for her residential treatment was on par with analogous medical/surgical benefits within the Plan.   For purposes of the Parity Act, courts have recognized that skilled nursing and inpatient rehabilitation facilities are medical/surgical analogues to the residential mental health treatment that A.D. received. *See Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1159 (9th Cir. 2018).

In this case, the Plan requires that all services be "medically necessary."   The Plan allows Anthem to use clinical guidelines to assist in its determination of medical necessity.   Therefore, Defendants apply internal criteria in addition to the terms of the Plan to determine whether treatment received at skilled nursing/inpatient rehabilitation facilities as well as residential mental health treatment facilities is medically necessary.   Anthem relies on Milliman Care Guidelines ("MCG") in medical necessity reviews of inpatient stays.

Once a plan provides mental health benefits, "the Parity Act prohibits imposing treatment limitations applicable only to mental health benefits."   *Joseph F. v. Sinclair Servs.*, 158 F. Supp. 3d 1239, 1262 (D. Utah 2016).   A non-quantitative treatment limitation limits "the scope or duration of benefits for treatment under a plan or coverage." 29 C.F.R. § 2590.712(a).   They include medical management standards limiting or excluding benefits based on medical necessity or medical appropriateness.   Non-quantitative treatment limitations are permissible if the "processes, strategies, evidentiary standards, or other factors" used to apply the limitations "are

20

comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors" used to apply the limitation to medical/surgical benefits in the same treatment classification.   29 C.F.R. § 2590.712(c)(4)(i).   "[A]n insurer violates the Parity Act if it employs 'a nonquantitative limitation for mental health treatment that is more restrictive than the nonquantitative limitation applied to medical health treatments."   *Candace B. v. Blue Cross*, No. 2:19-cv-39, 2020 WL 1474919, at *4 (D. Utah Mar. 25, 2020).

"In addition to being either quantitative or nonquantitative, treatment limitations can be either 'facial (as written in the language or the processes of the plan) or as applied (in operation via application of the plan.'"   *James C. v. Anthem Blue Cross and Blue Shield*, No. 2-19-cv-38, 2021 WL 2532905, *18 (D. Utah June 21, 2021) (quoting *Peter E. v. United HealthCare Servs.*, No. 2:17-cv-435, 2019 WL 3253787, at *3 (D. Utah July 19, 2019)).   "As-applied limitations involve an unequal or discriminatory application of a plan's facially neutral limitations."   *Id.*

Here, Plaintiffs contend that Defendants violated the Parity Act with respect to A.D.'s claims for residential treatment at Fulshear from June 20 through August 27, 2019, because they used internal criteria that allowed for discharge from residential mental health treatment at any time after treatment began whereas the internal criteria for discharge from analogous medical/surgical treatment considers discharge only in the last of three "stages" of treatment following a developed treatment plan.   Defendants, however, argue that the discharge criteria Plaintiffs rely on is not a separate treatment limitation.   Rather, they claim that it is an application of the medical necessity treatment limitation, resulting from MCG's evidence-based methodology and best practices based on the available medical literature.

Under the MCGs, Plan participants or beneficiaries seeking coverage for residential mental health treatment can be discharged from that treatment at any time if Defendants determine that

certain "discharge criteria" are met.   This means that Plan participants or beneficiaries who are approved to begin receiving residential mental health treatment can be removed from treatment as soon as Defendants believe they have progressed to the point that they no longer need it, regardless of how far along they are in their treatment plans or services.   By contrast, the MCG's for skilled nursing facilities contain no "Discharge Criteria" that warrant discharge as soon as they are met. Instead, discharge is contemplated only for the third "stage" of care, which occurs as patients progress through a treatment plan and show progression, a therapeutic response to interventions, and an ability to transition out of treatment.

Defendants claim that the clinical criteria it uses is developed using the same evidentiary standards across all benefits and the differences are based on recommendations from a panel of experts with a broad range of medical expertise.   However, there is no inherent guarantee that these differences based on expert recommendations conform with the Parity Act's requirements. If Anthem itself or a panel of experts it employs determines criteria for mental health treatment that is not on par with criteria for medical/surgical treatment, there is a violation of the Parity Act.

Defendants argue that in reviewing the discharge requirements across residential treatment and analogous medical/surgical benefits, the substance of the discharge inquiry is the same—whether patients are able to be transferred safely to the lower level of care.   While the specific indications or requirements may differ, Defendants assert that the purpose of the discharge criteria under Stage 3 for skilled nursing and rehabilitation is to ensure that a patient's status is stable and that it is safe to go home to continue a lower level of care on an outpatient basis. Although Defendants contend that this is comparable to the discharge guidelines in the mental health residential treatment criteria, which considers a patient's risk status, functional status, and whether a lower level of care is available, their argument ignores the fact that Defendants create a

22

course of treatment and stages of care for medical/surgical patients that they do not create for mental health patients.

Defendants claim that any differences in the criteria or differences in the application of the criteria result from the differences in the illnesses involved.   But their failure to create a course of treatment for any mental health patient, while creating one for every skilled nursing and rehabilitation patient, ignores a mental health patient's need for a similar course of treatment. Defendants immediately begin evaluating mental health patients for discharge because they have no course of treatment in place recognizing the patient's needs.   Defendants are determining to discharge mental health patients after a matter of days even though no course of treatment is ever put in place and treatment providers tell them the programs take months to be effective. Defendants can essentially discharge Plan participants or beneficiaries from mental health residential treatment at any point, regardless of where they are in their course of treatment. Because there is no course of treatment in place, Defendants are looking only to whether a patient is acutely suicidal.   A.D.'s case demonstrates a patient with a history of self-harming behaviors and an inability to care for herself.   However, Defendants claim that a few days in a highly structured environment somehow cured her long-standing dysfunctional history.   A course of treatment would have addressed how to reverse her long-standing problems and considered the amount of time necessary to do so.   Instead, she was approved to attend a nine to twelve month program for five days.   Defendants decided A.D. no longer needed residential treatment in the middle of the planned course of treatment that had been established by her treatment team at Fulshear.

The court concludes that it is evident from A.D.'s case that the difference in the criteria, or Anthem's different application of the criteria, applies a more stringent limit on residential mental

health treatment than on the analogous skilled nursing treatment because mental health patients are not provided with a course of treatment plan or stages of care in connection with determining discharge.   Even if Anthem is determining medical necessity in both cases, it is doing so in a materially different way that significantly limits benefits for mental health treatment.   The court concludes that whether the disparity is the result of written criteria that allows a course of treatment and stages for discharge for surgical patients and not mental health patients or the result of applying the same criteria differently for surgical as opposed to mental health patients, both disparities are a Parity Act violation for which Plaintiffs are entitled to equitable relief. Defendants are applying separate and unequal treatment limitations to mental health patients that run afoul of the Parity Act's requirements.   The Parity Act was passed to prevent these types of differences.   Accordingly, the court grants Plaintiffs' motion for summary judgment on their Parity Act claim and denies Defendant's motion on the claim.

Plaintiffs requested the opportunity to submit further briefing identifying which equitable remedies might be most appropriately tailored to whatever Parity Act violation the court articulated.   The court recognizes that Plaintiffs may be entitled to benefits or relief for other redressable injuries under their Parity Act claim separate and apart from the benefits it seeks under its ERISA benefits claim. *See Candace B. v. Blue Cross*, No. , 2020 WL 1474919, at *10 (D. Utah March 26, 2020) (finding plan beneficiary could have injuries addressable under Parity Act, such as relieving injury for being subject to a plan whose coverage violates Parity Act, in addition to monetary injury relieved under benefits claim).   However, for the court to know the appropriate equitable benefits to award under the Parity Act, it would be instructive for the court to know whether the plan administrator awards benefits under the benefits claims on remand.   The court could remand the Parity Act claim with the benefits claims, but it is unclear whether Plaintiffs

would then need to initiate a new action to appeal those decisions, if necessary.   Therefore, the court concludes that the best course of action is to stay the case and administratively close it until the plan administrator determines the benefits claims on remand.   The court will stay the case after it determines Plaintiffs' attorney fees.   Once the plan administrator makes its determination on benefits, Plaintiffs may move to reopen the case and brief the appropriate equitable remedies for the Parity Act violation.

## CONCLUSION

Based on the above reasoning, Plaintiffs K.D. and A.D.'s Motion for Summary Judgment [ECF No. 44] is GRANTED IN PART AND DENIED IN PART, and Defendants Anthem Blue Cross and Blue Shield and Group Health Plan of United Technologies, Corporation's Joint Motion for Summary Judgment [ECF No. 37] is DENIED.   Plaintiffs' residential treatment and transitional living treatment claims are remanded to the plan administrator, and the court finds that Plaintiffs have demonstrated a Parity Act violation.   Plaintiffs may move for reasonable attorney's fees within twenty days of the date of this Order.   After the court determines attorney's fees, the court will stay and administratively close the case pending the plan administrator's decision on remand.   Plaintiffs may move to reopen the case for a determination of the appropriate remedies for the Parity Act claim after the plan administrator determines the benefits claims on remand.

DATED this 20th day of September 2023.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE

25